NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>FIBER-SPAN, INC.,<br><br>           Debtor. | Civ. No. 20-2244<br>(Consolidated with<br>Civ. No. 20-2245) |
| TRANSIT WIRELESS, LLC,<br><br>           Appellant,<br><br>    v.<br><br>FIBER-SPAN, INC. and ALLEGHENY<br>CASUALTY COMPANY,<br><br>           Appellees. | ON APPEAL FROM AN<br>ORDER OF THE UNITED<br>STATES BANKRUPTCY<br>COURT FOR THE<br>DISTRICT OF NEW<br>JERSEY<br>(Adv. Pro. No. 17-1431)<br><br>**OPINION** |

THOMPSON, U.S.D.J.

**INTRODUCTION**

This matter comes before the Court upon the appeals of the final judgment of the U.S. Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") filed by Transit Wireless, LLC ("Transit") and Daniel E. Straffi, Esq., Chapter 7 Trustee for Fiber-Span, Inc. ("Trustee"). The Court has decided this matter based on the parties' written submissions and oral argument, pursuant to Rule 8019 of the Federal Rules of Bankruptcy Procedure. For the reasons stated herein, the final judgment of the Bankruptcy Court (Adv. Pro. No. 17-1431, ECF No. 85) is affirmed in part and reversed in part.

**BACKGROUND**

I.    **Network**

This is a contract dispute involving a wireless communications network in New York City's subway system. In 2007, New York City's Metropolitan Transit Authority ("MTA") and its subsidiary, the New York City Transit Authority ("NYCTA"), awarded Transit an exclusive license to design and operate a wireless communications and data access network (the "Network") for the subway system in New York City. (Bankr. Ct. Op. at 7, Adv. Pro. No. 17-1431, ECF No. 84.) Transit's customers are wireless providers, including Verizon Wireless, AT&T Mobile, T-Mobile USA, and Sprint, which access the Network to facilitate wireless voice and data services. (*Id.* at 7–8.) The Network was to be constructed in two phases: the "Initial Build," comprising six subway stations, and the "Full Build," comprising the remaining 271 subway stations. (*Id.* at 8.)

For the Network to function, above-ground base stations generate radio frequency signals. (*Id.*) These signals are transported into subway stations, then back to the base stations. (*Id.*) This process is possible because of remote fiber nodes ("RFNs"), (*see id.*), which "act as power amplifiers extending the signal from the wireless carrier[s'] equipment into underground locations in the subway system" (Transit's Br. at 7, ECF No. 14).

Because Transit does not manufacture telecommunications equipment, it sought contracts for equipment and services from third parties. (Bankr. Ct. Op. at 8.) After receiving the MTA/NYCTA license, Transit issued a "Request for Proposals" ("RFP"). (*Id.* at 8–9.) The RFP sought a manufacturer to help develop, manufacture, and supply an "integrated fiber based broadband distribution unit [i.e., an RFN]." (*Id.* at 9.)

## II.    Agreement

Fiber-Span, Inc. ("Fiber-Span") responded to the RFP, and Transit selected Fiber-Span as the Network's equipment supplier. (*Id.*) Following negotiations, Fiber-Span offered Transit a 45% volume discount on all equipment purchased for the Network, as well as assumption of all research, development, and engineering costs if Fiber-Span were selected for the Full Build. (*Id.* at 10.)

On October 12, 2010, Fiber-Span and Transit entered into an agreement (the "Agreement"), whereby Fiber-Span would provide wireless telecommunications equipment and systems, including RFNs, for the Initial Build. (*Id.*) If selected by Transit, Fiber-Span would supply equipment for the Full Build. (*Id.*) After issuing an initial purchase order for $704,382.00, Transit issued an amended purchase order for "Phase #1 Pilot Equipment," including seventeen RFNs and "other equipment items," for $680,997.00. (*Id.*) The Agreement supersedes the RFP. (*Id.* at 10–11 (citing Agreement § 71, Transit's App. Vol. II.1 at A-538 to A-606, ECF No. 14-2).) The Agreement is governed by New York law. (Agreement § 68.)

### A.    *Initial Build Compensation*

In connection with Fiber-Span's pricing concessions, Transit and Fiber-Span agreed that, if Transit did not contract with Fiber-Span for the Full Build, Transit would compensate Fiber-Span $450,000.00 (the "Initial Build Compensation"). (*Id.* § 6.2.) Payment of the Initial Build Compensation is contingent on three conditions. (*Id.*)

### B.    *Specifications*

Attachments to the Agreement list specifications for Fiber-Span's equipment. (*See, e.g.*, *id.* Attach. E.) These specifications require that (i) the RFNs operate properly in an ambient temperature range of -25°C to +55°C; (ii) the RFNs consume a maximum of 395 watts of power;

3

(iii) the RFNs satisfy a "Mean Time Between Failures" ("MTBF") standard of 80,935 hours; and (iv) the RFNs have an "ingress rating" of an "IP66 Enclosure," meaning that they must be "impervious to . . . dust and dirt." (Bankr. Ct. Op. at 12 (citing Transit's App. Vol. II.1 at A-601); *see also id.* at 32.)

The Agreement also requires compliance with "[a]ll requirements . . . detailed in contract reference R-50529 between [Transit] and [the MTA/NYCTA]." (Transit's App. Vol. II.1 at A-598.) One of those requirements is that "[a]ll [Network] equipment units shall be passively cooled (+50˚C) so that fans and other moving parts will be minimized in the NYCT[A] System environment." (Trustee's Ex. F Part 1 at 22, ECF No. 15-9.) The Transit-MTA/NYCTA contract elaborates, "Fans can be used instead in the event this temperature range was inadequate in any or all locations." (*Id.*) Some of the specifications in the Transit-MTA/NYCTA contract differ from the Agreement's specifications. (*See* Bankr. Ct. Op. at 12–13.) The power-consumption and MTBF specifications are governed by the Agreement, not the Transit-MTA/NYCTA contract. (*See id.* at 13.) Under the Agreement, where specifications between the contracts conflict, the more stringent specification applies. (*See* Agreement § 71.)

C.   *Payment Schedule*

Under the Agreement, Transit must pay purchase orders based on seven milestones:

- Milestone 1: "10% of Purchase Order value with order (Advance Payment)";

- Milestone 2: "10% of Purchase Order value on delivery of critical components to Supplier";

- Milestone 3: "10% of Purchase Order value on [Fiber-Span] carrying out successful pre-testing to [Transit] approved test plan of units to be sent for [Federal Communications Commission ("FCC")]/[Underwriters Laboratories Inc. ("UL")]

4

testing";

- Milestone 4: "5% of Purchase Order value on passing FCC tests";

- Milestone 5: "5% of Purchase Order value on passing interoperability testing pursuant to [Transit] approved test plan";

- Milestone 6: "40% of Purchase Order value on delivery of ordered Materials to [Transit] pursuant to Article 23 and after successfully passing all required tests";

- Milestone 7: "20% of Purchase Order value on successful commissioning and Materials ready for commercial service or 3 months after delivery of Materials to [Transit,] whichever is the earlier."

(*Id.* § 13.1.)

## III.   Performance Bond

Under the Agreement, Fiber-Span was required to secure a performance bond issued by a surety. (*Id.* § 67.) On October 27, 2010, Allegheny Casualty Company ("Allegheny"), a surety company, issued a $704,382.00 performance bond (the "Performance Bond") pursuant to the Agreement. (Bankr. Ct. Op. at 16.) The Performance Bond states, in pertinent part,

> Whenever [Fiber-Span] shall be, and declared by [Transit] to be in default under the [Agreement], [Transit] having performed [its] obligations thereunder, [Allegheny] may promptly remedy the default, or shall promptly
>
> 1)   Complete the Contract in accordance with its terms and conditions, or
>
> 2)   Obtain a bid or bids for completing the [Agreement] in accordance with its terms and conditions, and . . . arrange for a contract between such bidder and [Transit], and make available as Work progresses . . . sufficient funds to pay the cost of completion less the balance of the contract price; but not exceeding [$704,382.00].

(Transit's App. Vol. II.1 at A-608.) The Performance Bond provides, "Any suit under this bond must be instituted before the expiration of two (2) years from the date on which final payment

5

under the [Agreement] falls due." (*Id.*) The Performance Bond adds, "[Allegheny] hereby waives notice of any alteration or extension of time made by [Transit]." (*Id.*) Transit paid a premium on the Performance Bond. (Transit's App. Vol. II.2 at A-716, ECF No. 14-3; *see also* Agreement § 67.)

## IV.    Events and Communications

Between October 14, 2010 and April 4, 2011, Fiber-Span issued four invoices to Transit. (Bankr. Ct. Op. at 17–18.) Transit paid each invoice. (*Id.*) These payments corresponded to Milestones 1–4 in the payment schedule. (*Id.*)

A.    *Pre-Delivery Issues*

Before delivery, Transit became aware of an issue regarding high surface temperatures of the RFNs. (*Id.* at 21.) The Transit-MTA/NYCTA contract requires compliance with UL specifications, which include surface-temperature standards. (*Id.* (citing Malaki Test. 46:9–48:2, Transit's App. Vol. II.1 at A-433 to A-469); *see also* Transit's App. Vol. II.2 at A-621 (incorporating UL standards into the Transit-MTA/NYCTA contract); Agreement § 44.1 (establishing that "[Fiber-Span] shall be liable for compliance and all costs associated with . . . any other applicable regulations and requirements in connection with the Material to be delivered").) Transit sent a letter to Fiber-Span, indicating it was "critical that when the RFN is operating in the highest ambient temperature that no external surface exceeds 60 degrees Celsius otherwise protection would need to be incorporated." (Trustee's Ex. F Part 2 at 335, ECF No. 15-10.) In response to Transit's concerns, Fiber-Span informed Transit that it was "in [the] process of incorporating an RFN engineering improvement" and that it would "retrospectively deploy this solution to the 17 RFN[s] being delivered." (*Id.* at 338.)

On April 12, 2011, Transit notified Fiber-Span that the RFNs, with improvements, could

6

"only be accepted" when "all testing is passed" and "[t]he product is 100% meeting the approved specifications, including MTBF, dimensions, [and] external temperature." (*Id.* at 337–38.) Fiber-Span responded, "Product acceptance will occur after successful . . . testing this week per our approved schedule to deliver the RFN[s] on Monday[,] April 18, 2011 which is when transfer of ownership to [Transit] takes place. This is the only way the RFN[s] will ship next Monday." (*Id.* at 337.)

The next day, Fiber-Span issued an invoice to Transit corresponding to Milestone 5. (Bankr. Ct. Op. at 18.) Transit paid the invoice. (*Id.* at 18–19.)

On April 14, 2011, Transit's Chief Executive Officer ("CEO") stated that Fiber-Span had "passed critical interoperability testing at their plant[,] . . . add[ing] to successful FCC, safety and environmental testing over the past few weeks and . . . allow[ing] [Transit] to progress with installation of 16 [RFNs] in the Initial Build stations starting next week." (Trustee's Ex. F Part 2 at 341.) In an internal e-mail, Transit's Chief Technology Officer ("CTO") advised that he "'conditionally' signed off on the [factory acceptance testing] for the RFNs." (Bankr. Ct. Op. at 20.) He added, "The RFNs passed all but the power measurement and resultant heat limits. The specification states 395 Watts under full load; however, the units are measuring 500 Watts under full load." (*Id.*) The Bankruptcy Court concluded that the CTO's "conditional sign-off" "waived any argument that the testing, as to the power consumption issue, was not successfully passed." (*Id.*)

B.   *Post-Delivery Issues*

On April 18, 2011, Fiber-Span issued an invoice corresponding to Milestone 6. (*Id.* at 19.) The same day, Fiber-Span delivered the RFNs and other equipment to Hugh O'Kane Electric Company ("O'Kane"), Transit's contractor, for installation. (*Id.*) Transit paid

7

$640,000.00 to O'Kane to install the RFNs. (Bayne Nov. 28, 2018 Test. 52:17–19, Transit's App. Vol. I at A-189 to A-310, ECF No. 14-1.)

Issues regarding power consumption and surface temperature arose soon after installation. (Bankr. Ct. Op. at 30.) Specifically, the RFNs required excess power to generate a sufficient signal, and excess power consumption led to overheating and failure of the RFNs. (*Id.*) To address the overheating issue, Fiber-Span proposed a plan to "retrofit" the RFNs by installing fans on the units. (*Id.*)

On May 13, 2011, Transit sent Fiber-Span a letter describing "a number of items that will need to be resolved or clarified regarding the recent and planned product delivery." (Transit's App. Vol. II.2 at A-613.) One "key item[]" was the RFNs' temperature. (*Id.*) Transit explained that several tests were either incomplete or certain test results had not been provided. (*See id.* at A-613 to A-614.) Transit also listed "several other items that are required before [Transit] can consider the product as fully accepted." (*See id.* at A-614 to A-616.) Transit warned, "The proposed solution will be responded to formally however it is unlikely that this solution will be accepted, as the MTA/NYCT[A] specification calls for passive cooling." (*Id.* at A-613.) In a May 16, 2011 letter to Fiber-Span, Transit stated, "The excessive heat output is of serious concern to [Transit]," and "there are a number of questions that would need to be answered and considerations that should be taken into account before [Fiber-Span's] proposed solution could be implemented." (*Id.* at A-625.)

On May 20, 2011, Fiber-Span responded with details about its proposed solution. Fiber-Span explained that, "for the [p]ilot[,] all RFN[] modules . . . will have fans and . . . a safety shield." (*Id.* at A-628.) Fiber-Span would then implement a solution that would "integrate higher efficiency RF amplifiers into the RFN service modules and additional thermal engineering

8

advances into the production RFN[s]" to "reduc[e] the total RFN power below 395 Watts." (*Id.*) The "production units [would] be passively cooled." (*Id.*) This "passively cooled solution" would be applied to the "[p]ilot RFN modules" at no cost to Transit. (*Id.*)

On May 24, 2011, Transit requested additional information regarding the "interim solution" and the "higher efficiency [permanent] solution." (*See id.* at A-631.) Transit noted that it "has not approved any solution," and that "[a]pproval can only be[] given when a solution is demonstrated to be safe and fully meet specification." (*Id.* at A-633.)

On May 31, 2011, Fiber-Span responded that "[t]he modules that will receive higher efficiency amps will be determined prior to the production run," and "the timing of [the higher efficiency solution] . . . will be determined after receipt of the production order and delivery schedule." (Trustee's Ex. F Part 2 at 352.) The schedule for the "interim solution" had not yet been determined. (*Id.*) Fiber-Span maintained, "The RFN meets its specifications over the temperature range and there was no spec[ification] for surface temperature heat." (*Id.*) Rather, Fiber-Span explained, "This is a [Transit] accommodation that we are providing at no product cost." (*Id.*)

On June 1, 2011, Fiber-Span sent the seventh invoice to Transit. (Bankr. Ct. Op. at 22.) The invoice states, "Progress Payment, 20% of purchase order value, $680,997.00 due 3 months after delivery of materials or successful commission and materials ready for commercial service, whichever is the earlier. Equipment delivered on April 12, 2011[.] Invoice due date is July 12, 2011[.]" (Transit's App. Vol. II.2 at A-734.) Transit made two handwritten notations on the invoice. One notation reads, "Pay 50% immediately[.] Balance to be paid if agreed by [Transit's CEO] at later date or on delivery of fully compliant RFN (scheduled for Nov[.] 1[,] 2011)[.]" (*Id.*) The other notation states, "50% = $68,099.7[0.] Will be 90% paid of contract value

9

$680,997." (*Id.*) Contrary to the invoice, the equipment was delivered on April 18, not April 12. (Bankr. Ct. Op. at 23.)

C.    *Retrofit*

On June 21, 2011, Fiber-Span began retrofitting the RFNs by cutting holes in the units and installing fans and safety shields. (*Id.* at 32.) Unfortunately, the retrofit led to additional nonconformities. The Agreement required the RFNs, which contain sensitive electronic parts, to be impervious to dust and dirt. (*Id.* at 32–33.) Because the RFNs contained holes, steel brake dust from the subway system could enter the RFNs. (*Id.*)

On July 7, 2011, Transit sent Fiber-Span a letter indicating that the RFNs were "outside the contractual specification." (Transit's App. Vol. II.2 at A-636.) The letter specified that "[t]he power consumption of the RFNs supplied [is] higher . . . than the 395 watts fully loaded that is defined in [the Agreement]." (*Id.*) The letter also recognized that Fiber-Span was working to rectify the related issues of power consumption and surface temperature by November 1, 2011. (*Id.*) Transit asserted, "Until th[at] plan has been successfully executed," "testing has taken place to demonstrate that the RFNs are inside specification[,] and a Certificate of Conformance is issued to Transit," Transit would be "unable to consider the RFNs as accepted." (*Id.*)

On July 10, 2011, Transit paid Fiber-Span's invoice for Milestone 6. (Bankr. Ct. Op. at 19, 22.) On July 20, 2011, Transit paid Fiber-Span $68,099.70, half of the Milestone 7 invoice. (*Id.* at 23.)

Minutes from a July 24, 2011 meeting between Transit and Fiber-Span indicate that the retrofit was an "interim solution," and a "permanent solution without fans" would be developed by November 1, 2011. (*Id.* at 28 (quoting Transit's App. Vol. II.2 at A-634).) The minutes also indicate that the seventeen Initial Build RFNs would be "upgraded by Fiber-Span without

10

charge." (Transit's App. Vol. II.2 at A-634.)

In September 2011, Fiber-Span explained in an e-mail to Transit that the seventeen RFNs were "[p]ilot prototype units," not "[p]roduction units." (*Id.* at A-645.) In Transit's view, the parties contracted for "production units," the units did not meet specifications, the units had "reliability problems," and the units were "further from specification than when originally supplied." (*Id.* at A-644.) Transit asked Fiber-Span if it would be able to deliver new RFNs on November 1, 2011, as it had previously committed. (*Id.*) Fiber-Span responded, "We can commit to this upgrade before year end contingent on the technical discussion and agreement between our teams on any new requirements. Obviously we want to upgrade these units asap and will drive towards that happening." (*Id.* at A-642.)

     D.    *Post-Launch Communications*

The MTA/NYCTA accepted the Initial Build on September 23, 2011. (Bankr. Ct. Op. at 35.) On September 27, 2011, Transit and the MTA/NYCTA launched the Network in the six Initial Build stations. (*Id.*) A MTA/NYCTA press release indicated that the Network was providing "seamless coverage from above ground to underground stations." (*Id.*)

On November 18, 2011, Transit requested that Fiber-Span develop a "detailed project schedule for the release of the production version RFNs." (*Id.*) Fiber-Span responded that a schedule would be developed "at the time of new order placement" and that "[r]eplacement of [p]ilot to [p]roduction RFNs can begin in Q2[]2012 along with Full Build Deliveries." (*Id.*) In January 2012, Transit directed Fiber-Span to replace all seventeen RFN units because of "the existence of steel dust particles within the RFN enclosure." (Transit's App. Vol. II.2 at A-654.) Fiber-Span indicated that it had previously offered Transit the option of upgrading the RFNs to a "fan[-]less version by [the end of 2011]" or "having the [p]ilot RFN[s] replaced with

11

[p]roduction units upon receipt of a [p]roduction order in Q1 2012 for the next round of 30 stations." (Bankr. Ct. Op. at 36.) Transit responded that "the product provided by Fiber-Span is outside contractual specification and until a product is delivered that fully meets specification, accompanied by a certificate of conformance, Fiber-Span [is] in breach of [its] contractual obligation." (Transit's App. Vol. II.2 at A-657.) In March 2012, Fiber-Span indicated that it could deliver "the fully vetted and tested product" within a sixteen-week window. (*Id.* at A-662.)

Transit ultimately selected a different equipment supplier, SOLiD Technologies, USA ("SOLiD"), for the next thirty subway stations. (Bankr. Ct. Op. at 37; *see also* Bayne Nov. 28, 2018 Test. 113:5–10.) Transit informed Fiber-Span of its decision in a telephone call on July 17, 2012. (Bankr. Ct. Op. at 37.) In a July 23, 2012 e-mail, Fiber-Span asserted that its position "all along" was that it would only modify the "[p]ilot product" when it received a commitment "for the [p]roduction run of the next stations." (Transit's App. Vol. II.2 at A-672.) Fiber-Span added that "the [p]ilot product is fully compliant," it "met its specifications," and Transit owed Fiber-Span the Initial Build Compensation. (*Id.*) Transit's position was that "a commitment cannot be made until a fully developed product that meets specification is available." (*Id.*)

In September 2012, Fiber-Span sought the $450,000 Initial Build Compensation from Transit. (Bankr. Ct. Op. at 39.) Transit replied that the Initial Build Compensation was not due until Fiber-Span delivered conforming equipment. (*Id.*)

On July 18, 2013, Transit submitted a final installment payment to Fiber-Span. (Transit's App. Vol. II.2 at A-736.) Transit deducted $66,687.74 in "Warranty Repair Costs." (*Id.* at A-675, A-736.) Transit's net payment amounted to $15,943.96. (*Id.* at A-735 to A-736.)

As of July 23, 2013, Fiber-Span refused to repair the RFNs, provide service, or sell spare parts to Transit. (Bankr. Ct. Op. at 40.) Under the Agreement, Fiber-Span is obligated to offer

12

"functionally equivalent maintenance, replacement or spare parts," and repair services until the later of (i) twenty years after the "discontinued availability date of Material," or (ii) twenty years after the expiration or termination of the Agreement. (Agreement §§ 32–33.)

On September 4, 2013, Transit notified Fiber-Span that it had materially breached the Agreement. (Transit's App. Vol. II.2 at A-676.) Transit invoked the Agreement's settlement provision. (*Id.*) On September 6, 2013, Transit notified Allegheny that Fiber-Span was in breach of the Agreement. (*Id.* at A-677.) Transit accordingly requested that Allegheny perform its obligations under the Performance Bond. (*Id.* at A-678.)

Transit used the RFNs through May 2014. (Bankr. Ct. Op. at 41.)[1]

## V.    Procedural History

On March 31, 2015, Transit sued Fiber-Span and Allegheny in the New York Supreme Court, County of New York. (*Id.* at 4.) The Complaint asserted breach of contract and four other counts against Fiber-Span and breach of the Performance Bond against Allegheny. (Transit's App. Vol. I at A-44 to A-53.) Allegheny filed an Answer (*id.* at A-58 to A-80), and Fiber-Span filed an Answer and Counterclaims, (Bankr. Ct. Op. at 4).

In September 2016, Fiber-Span filed a Chapter 7 bankruptcy petition in the U.S. Bankruptcy Court for the District of New Jersey. (*Id.*) Daniel E. Straffi, Esq. was appointed Chapter 7 trustee of Fiber-Span's bankruptcy estate. (*Id.*)

In October 2016, Allegheny removed this action to the U.S. District Court for the Southern District of New York. (*Id.* at 4–5.) The case was transferred to this District, then

---

[1] One of Transit's witnesses testified at trial that the process of replacing Fiber-Span's equipment began in summer 2013 and ended in May 2014. (Malaki Test. 30:15–24, Transit's App. Vol. II.1 at A-433 to A-469, ECF No. 14-2.)

referred to this District's Bankruptcy Court. (*Id.* at 5.)

Trustee and Allegheny filed motions for summary judgment, which the Bankruptcy Court denied. (Adv. Pro. No. 17-1431, ECF Nos. 41, 42.) In its oral decision, the Bankruptcy Court concluded that Transit could not seek incidental or consequential damages under the Agreement. (Summ. J. Op. Tr. 24:11–12, Adv. Pro. No. 17-1431, ECF No. 45.)

A trial was held from November 28–30, 2018. (Adv. Pro. No. 17-1431, ECF Nos. 57–59.) On February 18, 2020, the Bankruptcy Court issued an Opinion concluding that Fiber-Span breached the Agreement (Bankr. Ct. Op. at 40–41), Transit is not liable for the Initial Build Compensation (*id.* at 41–45), and Allegheny is not liable under the Performance Bond (*id.* at 49–50). The Bankruptcy Court entered judgment (i) in favor of Transit and against Fiber-Span in the amount of $1,283,606.00, (ii) in favor of Transit and against Fiber-Span with respect to the Initial Build Compensation, and (iii) in favor of Allegheny and against Transit with respect to the Performance Bond. (Bankr. Ct. J. at 2, Adv. Pro. No. 17-1431, ECF No. 85.)

On February 28, 2020, Transit and Trustee appealed the Bankruptcy Court's final judgment. (ECF No. 1; Civ. No. 20-2245, ECF No. 1.) Transit appeals the Bankruptcy Court's conclusion that Allegheny is not liable on the Performance Bond. (Transit's Br. at 1.) Trustee appeals the Bankruptcy Court's conclusions that Transit is entitled to $1,283,606.00 and Transit is not liable for the Initial Build Compensation. (Trustee's Br. at 21–23, ECF No. 15.) This Court consolidated the two appeals. (ECF No. 13.) Transit and Trustee filed principal briefs (ECF Nos. 14, 15), Allegheny and Transit filed Oppositions (ECF Nos. 18, 19), and Transit and Trustee filed Replies (ECF Nos. 20, 21). The Court held oral argument on January 14, 2021. The appeals are presently before the Court.

## JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Court had jurisdiction over this action under 28 U.S.C. § 157(b). This Court has jurisdiction under 28 U.S.C. § 158(a).

The Court reviews "the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *In re Am. Pad & Paper Co.*, 478 F.3d 546, 551 (3d Cir. 2007). "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *FTC v. AbbVie Inc.*, 976 F.3d 327, 368 (3d Cir. 2020) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). The Court "must break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992).

## DISCUSSION

### I.   Breach

Breach of contract is a question of fact. *See United States ex rel. N. Maltese & Sons, Inc. v. Juno Constr. Corp.*, 759 F.2d 253, 255 (2d Cir. 1985) (citing *Sweezy v. O'Rourke*, 123 N.E. 752, 752 (N.Y. 1919)). The Bankruptcy Court concluded that Fiber-Span breached the Agreement. (*See* Bankr. Ct. Op. at 27–28, 40–41.)

This Court concludes that Transit did not waive the power-consumption specification. "Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006). "[W]aiver should not be lightly presumed and must be based on a clear

15

manifestation of intent to relinquish a contractual protection." *Id.* (internal quotation marks omitted). "Generally, the existence of an intent to forego such a right is a question of fact." *Id.*; *see also In re Best Payphones, Inc.*, 432 B.R. 46, 59–60 (S.D.N.Y. 2010) (applying clear error standard in analyzing waiver of contractual rights). Alongside his "conditional sign-off," Transit's CTO noted, "The RFNs passed all but the power measurement and resultant heat limits. The specification states 395 Watts under full load; however, the units are measuring 500 Watts under full load." (Bankr. Ct. Op. at 20.) The Bankruptcy Court, considering relevant evidence on this point, concluded that Transit did not "allow for" increased power consumption. (*See id.* at 27–28.) The Bankruptcy Court further determined that Transit's payment of the sixth invoice was a "business decision to move the process along, with the belief that the issue would be resolved," not a waiver of any specification. (*Id.* at 28.) Because Transit did not clearly manifest an intent to relinquish protection of the power-consumption specification, Transit did not waive that contractual requirement.

Beyond the power-consumption specification, the Bankruptcy Court did not clearly err in finding that the RFNs did not satisfy the ingress specification. (*See id.* at 41.) Nor did the Bankruptcy Court clearly err in determining that Fiber-Span breached §§ 32 and 33 of the Agreement by failing to repair the RFNs, provide service, or sell spare parts to Transit as of July 2013. (*See id.* at 40.) Therefore, the Bankruptcy Court's conclusion that Fiber-Span breached the Agreement is not clear error.[2]

---

[2] Regarding surface temperature, the Bankruptcy Court concluded that (i) Transit did not prove the RFNs failed any surface-temperature test, and (ii) the record suggests that the RFNs complied with surface-temperature standards after the retrofit. (Bankr. Ct. Op. at 21, 28, Adv. Pro. No. 17-1431, ECF No. 84; *see also* Trustee's Ex. F Part 2 at 415, ECF No. 15-10.) The Bankruptcy Court made no explicit finding that the RFNs violated the "Mean Time Between

## II.    Rejection

Rejection of goods is generally a question of fact. *See ICS/Executone Telecom, Inc. v. Performance Parts Warehouse, Inc.*, 171 A.D.2d 1066, 1066 (N.Y. App. Div. 4th Dep't 1991) (citing *White v. Schweitzer*, 221 N.Y. 461, 464–65 (N.Y. 1917)); *Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son, Inc.*, 701 F.2d 1049, 1051–52 (2d Cir. 1983) (applying New York law); 4 David Frisch, Lawrence's Anderson on the Uniform Commercial Code § 2-606:31, at 205–06 (3d ed. 2014). In some instances, the Bankruptcy Court states that Transit rejected the RFNs. (*See* Bankr. Ct. Op. at 25 (explicitly referring to the RFNs as "rejected material"); *see id.* (stating that the RFNs were "non-compliant and rejected" as of July 18, 2011).) In other instances, the Bankruptcy Court's analysis raises questions as to whether Transit rejected the RFNs. (*See id.* at 1 (describing the RFNs as "being held in a limbo-like state between rejection and acceptance"); *id.* at 47 (explaining that, because Transit "never explicitly stated that the goods were rejected," its continuous use of the RFNs "would easily fit the definition of failure to make an effective rejection . . . but for Transit's position that it was allowing Fiber-Span to cure") (emphasis omitted)).) Because the Bankruptcy Court explicitly stated that Transit had rejected the RFNs as of July 18, 2011, the fairest reading of the Opinion appears to be that Transit rejected the RFNs.

Under New York's Uniform Commercial Code ("U.C.C."), a buyer may reject goods if the goods "fail in any respect to conform to the contract." N.Y. U.C.C. § 2-601. "Rejection of goods must be within a reasonable time after their delivery or tender," and the buyer must

---

Failures" ("MTBF") specification. Trial testimony conflicted as to whether the RFNs' post-delivery failures contravened the MTBF requirement. (*Compare* Bayne Nov. 28, 2018 Test. 72:22–24, Transit's App. Vol. I at A-189 to A-310, ECF No. 14-1, *and* Bayne Nov. 29, 2018 Test. 68:17–24, 70:21–71:3, Transit's App. Vol. I at A-314 to A-368, *with* Wojtunik Test. 120:24–121:22, Transit's App. Vol. II.1 at A-470 to A-537.)

"seasonably notif[y] the seller." *Id.* § 2-602(1). Rejection must be made by a "clear and unequivocal act." *See Maggio Importato, Inc. v. Cimitron Inc.*, 189 A.D.2d 654, 654 (N.Y. App. Div. 1st Dep't 1993). "[M]ere complaint about the goods" does not suffice. *See id.*

The Bankruptcy Court did not clearly err in concluding that Transit rejected the RFNs. Evidence in the record supports the Bankruptcy Court's conclusion that Transit rejected the RFNs as initially installed: Soon after installation, Transit notified Fiber-Span of the overheating issue, withheld payment of the sixth invoice, and informed Fiber-Span that it must provide a solution for the invoice to be processed. (*See* Trustee's Ex. F Part 2 at 347.) Throughout the parties' correspondence regarding the retrofit, Transit articulated that it had not yet accepted any solution: On May 13, 2011, Transit warned that "it is unlikely that this solution will be accepted" (Transit's App. Vol. II.2 at A-613), and on May 24, 2011, Transit explained that "[a]pproval can only be[] given when a solution is demonstrated to be safe and fully meet specification" (*id.* at A-633). And after the retrofit began, on July 7, 2011, Transit notified Fiber-Span that it considered the RFNs to be "outside the contractual specification." (*Id.* at A-636.) Transit added that, until Fiber-Span executed its plan to "rectify [the power consumption] failure and the associated problem of excessive heat," "testing . . . demonstrate[d] that the RFNs are inside specification[,] and a Certificate of Conformance [was] issued to Transit," Transit would be "unable to consider the RFNs as accepted." (*Id.*) Transit's communications reasonably constituted a rejection of the RFNs.

## III.    Acceptance

Acceptance of goods is ordinarily a question of fact. *See ICS/Executone*, 171 A.D.2d at 1066 (citing *White*, 221 N.Y. at 464–65; *Fil-Coil Co. v. Int'l Power Sys. Equip. Corp.*, 123 A.D.2d 599, 600 (N.Y. App. Div. 2d Dep't 1986)); *In re Barney Schogel, Inc.*, 12 B.R. 697, 712

(S.D.N.Y. 1981). The Bankruptcy Court determined that, as of July 23, 2012 at the latest, "Transit had knowledge that Fiber-Span was no longer seeking to cure." (Bankr. Ct. Op. at 49.) The Bankruptcy Court concluded that Transit's "failure to effectively reject after that point, along with its continued possession and use of the goods in a manner inconsistent with Fiber-Span's ownership, constitute acceptance of the goods." (*Id.*)[3]

Under the Agreement, Transit was entitled to have the RFNs replaced after rejecting them. (Agreement § 28.1.) Additionally, if Transit rejected "any or all Repaired Materials," it was entitled to "request [Fiber-Span] to provide new or re-furbished Material of acceptable form, fit, and function as rejected Repaired Material . . . at no charge to [Transit]." (*Id.* § 28.2.) Fiber-Span was entitled to notify Transit of its intention to cure and then make a conforming delivery. *See* N.Y. U.C.C. § 2-508.

Under the U.C.C.,

[o]n rightful rejection . . . a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller.

N.Y. U.C.C. § 2-711(3). "[I]f the buyer has before rejection taken physical possession of goods in which he does not have a security interest [under § 2-711(3)], he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them." *Id.* § 602(2)(b). In the latter scenario, "the buyer has no further

---

[3] The Bankruptcy Court determined that "the preponderance of the evidence supports Fiber-Span's position that, as of May 31, 2011, it felt it was only providing a conforming tender based upon an order for the Full Build." (Bankr. Ct. Op. at 47.) Elsewhere in its Opinion, however, the Bankruptcy Court concluded, "The record developed is not sufficient to make a definitive finding that, as of May 31, 2011, it was clear that Fiber-Span would not do any further work on the retrofit RFNs until it received the Full Build production order." (*Id.* at 32.)

19

obligations with regard to goods rightfully rejected." *Id.* § 602(2)(c).

At issue is whether Transit was entitled to use the RFNs after learning that Fiber-Span would not replace them without additional production orders. Under the U.C.C., acceptance can occur after rejection through "any act inconsistent with the seller's ownership." *Id.* § 2-606(1)(c); *see also Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986) (acceptance under U.C.C. § 2-606(1)(c) invalidated a purported revocation of acceptance); *J.L. Clark Mfg. Co. v. Gold Bond Pharm. Corp.*, 669 F. Supp. 40, 43 (D.R.I. 1987) (acceptance under Pennsylvania's version of U.C.C. § 2-606(1)(c) was inconsistent with the buyer's purported rejection); 2 Richard A. Lord, Williston on Contracts § 6:55, at 789 (4th ed. 2007) (indicating that a buyer can accept goods under U.C.C. § 2-606(1)(c) after rejection). Continuous use of goods by a buyer can constitute acceptance. *See, e.g.*, *Hooper Handling, Inc. v. Jonmark Corp.*, 267 A.D.2d 1075, 1076 (N.Y. App. Div. 4th Dep't 1999) (buyer's use of shelving and mezzanine, despite initial complaints, constituted acceptance); *Sears, Roebuck & Co. v. Galloway*, 195 A.D.2d 825, 826–27 (N.Y. App. Div. 3d Dep't 1993) (buyer's continued retention and use of a boiler for "a substantial period of time, . . . despite plaintiff's offers to remove the boiler and credit her account," constituted acceptance); *Kesco Textile Co. v. Coit Int'l, Inc.*, 41 A.D.2d 828, 828 (N.Y. App. Div. 1st Dep't 1973) (buyer's use of polyester goods constituted acceptance), *aff'd* 313 N.E.2d 74 (N.Y. 1974); *Sobiech v. Int'l Staple & Mach. Co.*, 867 F.2d 778, 781 (2d Cir. 1989) (buyer's control over machines for over three years constituted acceptance).

Post-rejection use of nonconforming goods, however, is not an acceptance in every case. Courts have concluded that, where a buyer's use of goods is reasonable, such use does not invalidate a prior rejection or revocation of acceptance. *See, e.g.*, *Genesis Health Clubs, Inc. v.*

*LED Solar & Light Co.*, 639 F. App'x 550, 556–57 (10th Cir. 2016) (quoting *L.S. Heath & Son,*

*Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 568 (7th Cir. 1993), *abrogated on other grounds by*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)) (considering

whether the buyer's use was "necessary to avoid substantial hardship"); *Deere & Co. v. Johnson*,

271 F.3d 613, 619–20 (5th Cir. 2001) (considering cost of replacement); *J.L. Clark*, 669 F. Supp.

at 42–43 (considering the reasonableness of the buyer's use after rejection); *Wilk Paving, Inc. v.*

*Southworth-Milton, Inc.*, 649 A.2d 778, 782 (Vt. 1994) (citing *McCullough v. Bill Swad*

*Chrysler-Plymouth, Inc.*, 449 N.E.2d 1289, 1292–93 (Ohio 1983)) (applying a multi-factor test);

*N. River Homes, Inc. v. Bosarge*, 594 So.2d 1153, 1161 (Miss. 1992) (considering the seller's

promises to repair defects and the buyer's financial burden); *Ozark Kenworth, Inc. v. Neidecker*,

672 S.W.2d 899, 903 (Ark. 1984) (explaining that the effect of the buyer's use is "determined on

a case by case basis," with reasonableness "being the underlying consideration"); *Johannsen v.*

*Minn. Valley Ford Tractor Co.*, 304 N.W.2d 654, 658 (Minn. 1981) (applying a multi-factor

test); *Erling v. Homera, Inc.*, 298 N.W.2d 478, 482–83 (N.D. 1980) (considering the seller's lack

of instructions regarding use and the seller's assurances that defects would be cured).

The evidence in the record, taken as a whole, demonstrates that Transit's use of the

rejected RFNs after July 23, 2012 was reasonable. This is so for three reasons. First, suspending

use of the RFNs while seeking to replace them would have left the Network inoperable in the

Initial Build stations for a substantial period of time. (*See* Bayne Nov. 28, 2018 Test. 45:11–14

("This is not equipment that you could take out and replace in a matter of days or weeks. This is

a multi[-]year relationship and a very complex multi[-]year path to replace the equipment."); *id.*

at 67:10–16 ("[E]ven with [Fiber-Span], it would have been a nine-month process [to replace the

RFNs]. A new supplier starting from scratch, customizing the products, going through the

qualification testing, the FCC testing, [would take] 18 to 24 months . . . [m]inimum."); *id.* at

68:1–3 (explaining that, in addition to replacing the RFNs, Transit would need to replace the

head-end equipment, which is "unique to the manufacturer"); Malaki Test. 26:7–20 (same); *id.* at

20:4–21:1 (explaining that, to replace the RFNs, Transit would need to find equipment providers,

redesign the equipment, conduct testing, and receive approval from the MTA/NYCTA); *id.* at

26:21–27:25 (explaining that SOLiD's equipment, unlike Fiber-Span's equipment, "did not

include wifi"; Transit "could not find [equipment] on the market that was readily available . . . to

perform that function"; and, therefore, Transit needed to design new equipment internally); *id.* at

25:12–19 (explaining that Transit was required to change electrical wiring and design a "brand

new piece of equipment . . . from scratch").)

     Second, evidence in the record indicates that suspending use of the RFNs for an extended

period of time would have undermined Transit's business arrangements with the MTA/NYCTA

and the wireless providers that access the Network. (*See* Bayne Nov. 28, 2018 Test. 14:20–21

(explaining that Transit "was really founded on the award of [the MTA/NYCTA] license"); *id.* at

21:18–23 (indicating that the MTA/NYCTA could cancel the license and reclaim equipment if

Transit failed to meet its requirements under the license agreement); *id.* at 25:2–8 (testifying that

Transit was required to meet the wireless providers' "service level requirements," and the

providers could "default and cancel" their agreements with Transit if persistent outages

occurred); *id.* at 99:22–25 ("[Transit was] under pressure from the [NYCTA] to get [the RFNs]

replaced, but they understood that [Transit] could not take them off air because now there was a

public service that . . . had to [be] maintain[ed]."); *id.* at 100:10–12 ("[Transit] would be

completely shut down and . . . in default of [its] license and . . . customer agreements."); Malaki

Test. 28:17–25 (explaining that Transit "would have problems with the carriers as well as with

[NYCTA]" if it shut down the Network in the Initial Build stations for more than a year).)

Third, there is no indication that Fiber-Span suffered undue prejudice from Transit's use of the RFNs. Fiber-Span never requested that Transit return the RFNs. (Bayne Nov. 29, 2018 Test. 62:17–22, Transit's App. Vol. I at A-314 to A-368; Wojtunik Test. 171:1–4, Transit's App. Vol. II.1 at A-470 to A-537.) Additionally, Fiber-Span continued to provide support to Transit by repairing and maintaining the RFNs until July 2013. (Bayne Nov. 28, 2018 Test. 117:25–118:4; Bayne Nov. 29, 2018 Test. 62:23–63:14; McCarthy Test. 161:7–162:19, Transit's App. Vol. II.1 at A-386 to A-400.)

Based on consideration of the evidence in the record, this Court concludes that Transit's post-rejection use of the RFNs was reasonable. Therefore, Transit's use of the RFNs after July 23, 2012 was not an acceptance.

## IV.    Transit's Damages

"Although calculation of the amount of damages is a factual determination, the formula used in making that calculation is a question of law." *Vt. Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir. 1998) (citing *N. Maltese & Sons*, 759 F.2d at 255 (applying New York law)). The Bankruptcy Court determined that Transit was entitled to $1,283,606.00, the amount Transit paid Fiber-Span plus the amount that Transit paid O'Kane for installation of the RFNs. (Bankr. Ct. Op. at 51.)

A buyer that rightfully rejects goods may recover "so much of the price as has been paid." N.Y. U.C.C. § 2-711(1). Because Transit rightfully rejected the RFNs, Transit is entitled to the $643,606.00 it paid Fiber-Span for the RFNs.

Transit and Trustee dispute whether Transit's $640,000.00 initial installation costs are recoverable general damages, on the one hand, or non-recoverable consequential or incidental

23

damages, on the other. (*See* Trustee's Br. at 54–55; Transit's Opp'n at 53–54, ECF No. 19.) A buyer's incidental damages include

> expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

N.Y. U.C.C. § 2-715(1). The costs of installing the rightfully rejected RFNs are incidental damages under § 2-715(1). Therefore, this Court concludes that Transit is not entitled to its initial installation costs.

**V.     Initial Build Compensation**

Fiber-Span is not entitled to the Initial Build Compensation. Under the Agreement, the Initial Build Compensation is contingent on the following conditions:

> 6.2.1   All Materials supplied must meet all obligations in the Agreement, including, but not limited to, the Specifications;
> 6.2.2   All Materials must be accepted by [Transit] as provided in Section 27 below;
> 6.2.3   [Fiber-Span] shall not have been in default of any of the terms and conditions of this Agreement or of any Purchase Order for Initial Build.

(Agreement § 6.2.)

Trustee contends that these contingencies are not "conditions precedent" (Trustee's Br. at 34–39), an argument that the Bankruptcy Court rejected (Bankr. Ct. Op. at 44). A condition precedent is "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (N.Y. 1995). "While specific, talismanic words are not required, the law nevertheless demands that conditions precedent be 'expressed in unmistakable language.'" *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (quoting *Oppenheimer*, 86 N.Y.2d at 691).

24

Under Trustee's theory, differences in language across sections of the Agreement render the Initial Build Compensation contingencies ambiguous. (Trustee's Br. at 36–37.) "Ascertaining whether or not a writing is ambiguous is a question of law . . . ." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)). Trustee reasons that § 6 requires that the RFNs "meet all obligations in this Agreement . . . [and] be accepted . . . as provided in [§] 27," § 27 requires that the RFNs be "fully in accordance with this Agreement," and § 24 requires that the RFNs be "fully compliant with the terms of this Agreement." (Trustee's Br. at 36–37 (quoting Agreement §§ 6.2, 24, 27).) But different uses of language across different Articles of the Agreement do not diminish Fiber-Span's obligation under § 6 to provide compliant goods. Trustee further argues that the definition of "Specifications" in § 6.2.1 is ambiguous because some requirements in the Agreement overlap with requirements in the Transit-MTA/NYCTA contract. (*Id.* at 37–38.) But § 71 of the Agreement provides that, where specifications between the contracts conflict, the more stringent specification applies. (*See* Agreement § 71.)

The Bankruptcy Court did not clearly err in concluding that Transit did not waive the Initial Build Compensation requirements. Trustee has not demonstrated that Transit's continued use of the RFNs was a clear manifestation of intent to waive the Initial Build Compensation contingencies. *See Fundamental Portfolio Advisors*, 850 N.E.2d at 658.

Nor did the Bankruptcy Court clearly err in finding that Fiber-Span would not suffer a "disproportionate forfeiture" if the contingencies were enforced. Forfeiture is "the denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially, as by preparation or performance on the expectation of that exchange." *Oppenheimer*, 86 N.Y.2d at 692 n.2. "[T]o the extent that the non-occurrence of a condition

25

would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." *Id.* at 691; *see also Danco Elec. Contractors, Inc. v. Dormitory Auth. of the State of N.Y.*, 162 A.D.3d 412, 413 (N.Y. App. Div. 1st Dep't 2018) (concluding that the plaintiff was excused from the non-occurrence of a condition in part because its noncompliance was de minimis). Trustee has not demonstrated that the contingencies are immaterial components of the Initial Build Compensation arrangement, nor that Fiber-Span's noncompliance was de minimis. Therefore, this Court affirms the Bankruptcy Court's conclusion that Fiber-Span is not entitled to the Initial Build Compensation.

## VI.   Allegheny's Liability Under Performance Bond

Whether Allegheny is liable under the Performance Bond depends on the "date on which final payment under the [Agreement] falls due." (*See* Transit's App. Vol. II.1 at A-608.) Transit was required to bring any suit against Allegheny within two years of that date. (*Id.*) The Bankruptcy Court concluded that final payment became due when Transit accepted the RFNs. (Bankr. Ct. Op. at 50.) This Court exercises plenary review over the Bankruptcy Court's interpretation. *See In re Energy Future Holdings Corp.*, 842 F.3d 247, 253 (3d Cir. 2016) (reviewing de novo the bankruptcy court's interpretation of contracts governed by New York law).

The text of Milestone 7 could support findings that final payment became due on July 18, 2011, three months after delivery, or on September 27, 2011, the Network's launch date. (*See* Agreement § 13.1.) But the Bankruptcy Court concluded that, upon delivery, "it was clear that the goods were non-conforming and Fiber-Span was continuing to make adjustments," and "[i]t is non-sensical that payment would be required for non-compliant and rejected goods." (Bankr. Ct. Op. at 25.) The Bankruptcy Court also declined to view the Network's launch as the trigger

for final payment because the Agreement does not define "commissioning" or "ready for commercial service," and "[n]either party addressed the specific issue." (*Id.* at 26.) Instead, the Bankruptcy Court concluded that final payment became due "after acceptance or . . . as of July 2012." (*Id.*)

Final payment did not become due three months after delivery or on the launch date. "It is the role of the courts to enforce the agreement made by the parties—not to add, excise or distort the meaning of the terms they chose to include, thereby creating a new contract under the guise of construction." *NML Cap. v. Republic of Argentina*, 952 N.E.2d 482, 489–90 (N.Y. 2011). Even so, the facts of this case do not fit neatly into § 13 of the Agreement: The payment deadlines negotiated by the parties do not contemplate nonconformance of the RFNs. By accounting for that discordance, the Bankruptcy Court sensibly concluded that acceptance triggers final payment in this case. *Cf. Town of Esopus v. Brinnier & Larios, P.C.*, 135 A.D.2d 935, 936 (N.Y. App. Div. 3d Dep't 1987) (holding that the buyer's suit against the surety under an identical limitations provision was time-barred where it was brought more than two years after performance was accepted and final payment was made).

Because Transit did not accept the nonconforming RFNs, however, Transit's suit against Allegheny is not time-barred and Allegheny is liable under the Performance Bond. "The liability of the surety on a performance bond customarily follows the liability of the principal on the bond." *Fidelity & Deposit Co. of Md. v. Parsons & Whittemore Contractors Corp.*, 48 N.Y.2d 127, 132 (N.Y. 1979). A surety's liability also includes interest from the date of the surety's default. *Town of Clarkstown v. N. River Ins. Co.*, 803 F. Supp. 827, 830 (S.D.N.Y. 1992) (citing N.Y. Gen. Oblig. Law § 7-301). Allegheny's default "dates from its receipt of [Transit's] notification" of Fiber-Span's breach. *See id.* Accordingly, this Court concludes that Allegheny is

27

liable under the Performance Bond in the amount of $643,606.00 plus interest at the New York rate of 9% per annum accruing from September 6, 2013. *See* N.Y. C.P.L.R. § 5004.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the final judgment of the Bankruptcy Court (Adv. Pro. No. 17-1431, ECF No. 85) is affirmed in part and reversed in part. The Court remands this case to the Bankruptcy Court with instructions to enter judgment in accordance with this Opinion. An appropriate Order will follow.

Date: <u>March 12, 2021</u>                    <u>*/s/ Anne E. Thompson*        </u>
                                        ANNE E. THOMPSON, U.S.D.J.